**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------

| | | |
|---|---|---|
| In re: | ) | **NOT FOR PUBLICATION** |
| | ) | |
| | ) | |
| DURR MECHANICAL | ) | Chapter 11 |
| CONSTRUCTION, INC., | ) | Case No. 18-13968 (DSJ) |
| | ) | |
| Debtor. | ) | |

------------------------------------------------------------

| | | |
|---|---|---|
| | ) | |
| DURR MECHANICAL | ) | |
| CONSTRUCTION, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Adv. Proc. No. 20-1214 (DSJ) |
| | ) | |
| - against - | ) | |
| | ) | |
| THE CITY OF NEW YORK and THE | ) | |
| NEW YORK CITY DEPARTMENT OF | ) | |
| ENVRONMENTAL PROTECTION, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

------------------------------------------------------------

## MEMORANDUM OF DECISION AND ORDER

**A P P E A R A N C E S:**

**CULLEN and DYKMAN LLP**
*Counsel for Durr Mechanical Construction, Inc.*
100 Quentin Roosevelt Boulevard
Suite 402
Garden City, NY 11530
By:    Elizabeth Aboulafia, Esq.
          C. Nathan Dee, Esq.

**NEW YORK CITY LAW DEPARTMENT**
*Counsel for the City of New York and the New York City Department of Environmental Protection*
100 Church Street
Room 3-124
New York, NY 10007
By:    Amanda Papandrea, Esq.

**DAVID S. JONES**
**UNITED STATES BANKRUPTCY JUDGE**

This case involves a high-dollar dispute between New York City and a City agency, on the one hand, and a general contractor that performed work on a major City project, on the other. Defendants the City of New York ("**the City**") and the New York City Department of Environmental Protection ("**DEP**" and, collectively, "**Defendants**") have moved to dismiss the adversary proceeding brought by Durr Mechanical Construction, Inc. ("**Durr**"), the debtor in a Chapter 11 bankruptcy before this Court.  [ECF No. 5 (the "**Motion to Dismiss**")].  They also have filed a supplemental motion [ECF No. 11 (the "**Motion to Compel ADR**")], seeking to compel alternative dispute resolution ("**ADR**") as to two of Durr's claims pursuant to a provision within the relevant contract between Durr and the City.  For the reasons that follow, the Court grants Defendants' Motion to Compel ADR, holds this action in abeyance, and reserves judgment on the Motion to Dismiss.

## I.   BACKGROUND

### A.  The Main Bankruptcy

Durr, a general contractor, filed a voluntary Chapter 11 petition in December 2018.  [Bankr. S.D.N.Y. 18-13968, ECF ("**Bankr. ECF**") No. 1 (the "**Petition**")].  The resulting bankruptcy case is assigned to the Honorable Lisa G. Beckerman.  [Bankr. ECF No. 503].  Durr recently filed an amended Chapter 11 plan of liquidation.  Bankr. ECF 510.  In April 2021, the Court approved Durr's disclosure statement and scheduled a hearing on confirmation of its third amended Chapter 11 plan.  [Bankr. ECF No. 525].

### B.  Factual History

Durr commenced the adversary proceeding in September 2020.  [ECF No. 1 (the "**Complaint**")].  Durr alleged that it entered a contractwith the City (the "**Contract**") in 2007 to work on the heating, ventilation, and air conditioning ("**HVAC**") at the Croton Water Filtration

Plant (the "**Croton Plant**") in the Bronx.  [*Id.* ¶ 11].

### 1.  History of the Croton Plant

The Croton Watershed serves as one of the three principal sources of drinking water for New York City.  [*Id.* ¶¶ 17–18].  The federal government and the New York State government required the City to build the Croton Plant, and the City stipulated with the state department of health that it would design the plant by 1995 and construct it by 1999.  [*Id.* ¶ 18].

The City breached the terms of that stipulation, and the federal government sued the Defendants in the United States District Court for the Eastern District of New York for violations of federal environmental laws.  [*Id.* ¶ 19].  New York State and the state department of health intervened, claiming violations of state environmental laws.  [*Id.*].  The District Court entered a consent decree (the "**Consent Decree**"), through which the City agreed to construct the Croton Plant (the "**Project**").  [*Id.* ¶ 20].

The Consent Decree defined temporal milestones by which the City was required to have completed successive phases of Project construction.  [*Id.* ¶¶ 21–23, 25].  The federal government, New York State, and the state department of health (collectively, the "**Regulators**") would enforce the City's compliance with each of the milestones by imposing financial penalties for any noncompliance by the City.  [*Id.* ¶¶ 22, 35].  The Consent Decree required the DEP to submit certified monthly progress reports on the Project.  [*Id.* ¶ 36].  The parties amended the Consent Decree multiple times, with the second such supplement (the "**Second Supplement**") containing the Project's operative deadlines at the time of the Complaint.  [*Id.* ¶¶ 26–27].

The Second Supplement includes both interim and long-term milestones.  [*Id.* ¶¶ 27–28].  In 2004, the City submitted certifications that it met several interim milestones, which the Regulators approved.  [*Id.* ¶¶ 29–31].  Among them was Interim Milestone O, set for May 1, 2011: the "Substantial Completion – Begin Start-up and Testing" for the Croton Plant's HVAC system.

[*Id.* ¶ 30].

### 2. Relevant Contract Provisions Referencing the Consent Decree and ADR

In the Complaint, Durr alleged as follows.  The Contract by which Durr was to perform HVAC work at the Croton Plant was made "subject to the terms of the Consent Decree," in that the Contract's terms expressly incorporated the Consent Decree's Long Term and Interim Milestones, referring to them as "Project Milestones."  [*Id.* ¶¶ 24, 34, 39].  The specific provision in question, titled "Detailed Specification 01271," provides:

> [t]he work under these Contracts shall be entirely completed in a manner acceptable to the City within the Period of Performance indicated in Schedule A in the General Conditions.  The work to be performed under [the Contract] is subject to the Order on Consent in the US District Court of Eastern New York [sic].

[ECF No. 1-1 at 22 (pdf pag.)]

The City included a similar provision in its contracts with all of its "prime contractors" on the Project, including Durr.  [ECF No. 1 ¶ 34 & n.11].  Accordingly, Interim Milestone O, with its May 1, 2011 completion date, was the deadline for Durr to complete its HVAC work under the Contract.  [*Id.* ¶ 29].  Neither the District Court nor the Regulators modified this Interim Milestone.  [*Id.* ¶ 32].

The City included liquidated damages provisions in all of its construction contracts for the Project.  [*Id.* ¶ 37].  These provisions required indemnification or offset on account of any monetary penalties assessed against the City under the Consent Decree if a contractor's performance caused a failure to meet one of the Project Milestones, the deadline for Durr's HVAC work among them.  [*Id.*].

Durr alleged that the incorporation of the Consent Decree's Long Term and Interim Milestones as Project Milestones, as well as the liquidated damages provisions against the prime contractors, "imposed fundamental affirmative obligations" on the City with regard to the prime

contractors.  [*Id.* ¶ 39].  These asserted obligations included providing the prime contractors with timely access to the work site, avoiding interference, disruption, and delay of the prime contractors' work so that they could meet the Project Milestones, supplying complete, coordinated designs and specifications, and effectively coordinating the work of the prime contractors.  [*Id.* ¶¶ 39–41].  Durr alleged that the City failed to satisfy these obligations.  [*Id.* ¶¶ 42–46].

Article 27 of the Contract, entitled "Resolution of Disputes," required the use of alternative dispute resolution as follows:

> 27.1 All disputes between the City and the Contractor of the kind delineated in this article that arise under, or by virtue of, this Contract shall be finally resolved in accordance with the provisions of this article and the PPB [Procurement Policy Board] Rules.  This procedure for resolving all disputes of the kind delineated herein shall be the exclusive means of resolving any such disputes.
>
> . . . .
>
> 27.1.2 This article shall apply only to disputes about the scope of work delineated by the Contract, the interpretation of Contract documents, the amount to be paid for Extra Work or disputed work performed in connection with the Contract, the conformity of the Contractor's Work to the Contract, and the acceptability and quality of the Contractor's Work[.]

[ECF No. 1-1 at 89 (pdf pag.)].

### 3.  Working on the Project

Concerning the Project itself, Durr alleged deficient performance by Defendants, as follows.  The City did not gain the approval of the City Art Commission a/k/a/ City Public Design Commission ("**Design Commission**") for the Project's above-grade work, including the above-grade HVAC.  [*Id.* ¶¶ 47, 51–52, 55].  The City submitted this incomplete design to the Regulators, and eventually to the contractors bidding on the Project. [*Id.* ¶¶ 56, 66–68, 75].

The City advertised for bids in April 2006, with DEP providing designs, plans, and specifications to the bidders.  [*Id.* ¶¶ 75, 78].  One month after the opening of the bids, DEP selected Grimshaw Architects. P.C. ("**Grimshaw**") to design the Croton Plant's above-grade structure in

conjunction with another firm, Design JV, which would design the Croton Plan's below-grade plans. [*Id.* ¶ 98]. The City's contract with Grimshaw provided that the prime contractors would not receive Grimshaw's design of the above-grade structures as a final coordinated product. [*Id.* ¶ 107]. Additionally, Grimshaw failed to coordinate its plans with Design JV. [*Id.* ¶ 108]. The Design Commission did not approve the Grimshaw designs until October 2009. [*Id.* ¶ 109].

Durr was the low bidder for the HVAC work and was awarded the Contract in May 2007. [*Id.* ¶ 80]. The Contract (1) had a base value of $105,700,000, [*id.* ¶ 83]; and (2) provided for Durr's procuring, installing, and completing the HVAC system for the Croton Plant's five–level, 1.8 million square foot underground facility, [*id.* ¶ 84]. The Contract discussed substantial completion:

> Article 44.1 of the Contract provides for the issuance of a certificate of Substantial Completion "[w]hen the Work in the opinion of the [DEP] Commissioner, has been substantially but not entirely completed . . ." Upon issuance of such a certificate, among other things, a contractor is entitled to submit a payment requisition for the issuance of a substantial completion payment for work performed together with a release of amounts retained under Article 21 of the Contract.

[*Id.* ¶ 86].

Over time, the total value of the Contract increased by $30,055,000 to $135,755,076, a total of 28.4 percent. [*Id.* ¶ 87]. These increases came from the "staggering" number of change orders needed to correct the purportedly final designs on which the original Contract was based. [*Id.* ¶¶ 87, 91]. These change orders, the product of Defendants having initially submitted incomplete designs, caused the City to direct Durr to start work on the Project six months later than anticipated by the Consent Decree. [*Id.* ¶¶ 89, 95]. More delays flowed from Grimshaw's lack of coordination with Design JV, and the late approval of the Grimshaw design. [*Id.* ¶¶ 111–12, 114].

Durr's time on the Project also involved "at risk" work, which occurs when a contractor

performs work outside the scope of its contract pursuant to a change order that the City Comptroller has yet to approve. [*Id.* ¶ 123]. In this case, Grimshaw's design was not complete until at least 2013, even though the City's "Schedule Recovery Plan" provided that all of Grimshaw's change orders would be issued before the end of December 2009. [*Id.* ¶¶ 126–27]. The Schedule Recovery Plan itself, a response to the various delays on the Project, caused additional delays. [*Id.* ¶¶ 134, 138].

Further complications arose in March 2010, when the City, upon receiving hundreds of requests for information and or clarification from the prime contractors, determined that Grimshaw's supposedly final designs were not complete. [*Id.* ¶ 142]. This "on the fly" design process "directly impacted" Durr's work, with design errors causing 90 percent of the change orders. [*Id.* ¶¶ 149–59, 166]. Durr also alleged that from August 2010 through September 2012, the City issued a series of change orders and stop work orders, which: (1) disrupted Durr's work and caused Durr a 50 percent loss of efficiency; (2) forced Durr to work out of sequence; and (3) restricted access to the job site. [*Id.* ¶¶ 170–74].

Despite all of these delays, the City declared to the Regulators on December 9, 2013 that it had achieved substantial completion on the HVAC work. [*Id.* ¶¶ 33, 147].

### 4. Substantial Completion

Durr's Complaint sought a declaratory judgment that it substantially completed its work on the Project pursuant to Article 44 of the Contract, and the Interim Milestones in the Second Supplement, despite Defendants' failure to so declare. [*Id.* ¶¶ 175–93]. Durr contended it attained substantial completion on December 9, 2013, when the City represented to the Regulators that it achieved substantial completion of the HVAC work. [*Id.* ¶ 176]. Durr alleged that the City made the work on the Project subject to the Consent Decree's Long Term and Interim Milestones by incorporating these milestones into the specification for the bidding materials and the Contract.

[*Id.* ¶ 34].  Durr asserted that it needed the declaration of substantial completion to: (1) begin the close-out process on the Contract; (2) obtain final acceptance under the Contract, absent which Durr remained liable for damages based on any of its work on the Project; (3) trigger the City's obligation to provide Durr with the final "punch list" for the Project, which also initiates the running of the guaranty period on Durr's work and the limitations period for Durr to sue the City for workplace damages; and (4) receive a payment from the City that was contractually due upon substantial completion Durr's work.  [*Id.* ¶¶ 177–80].

Durr further contended that the City's December 2013 declaration to the Regulators demonstrates that the City since then has been improperly holding over Durr as a completion contractor in order to force Durr to perform work outside the scope of the Contract.  [*Id.* ¶¶ 181–82].  Durr also argued that the City made additional representations to the Regulators after December 9, 2013, that affirmed that substantial completion occurred on that date.  [*Id.* ¶¶ 183–89].  Indeed, in a 2016 letter to the Regulators, DEP asked for the termination of the Consent Decree, a request that the District Court granted.  [*Id.* ¶¶ 192–93].

Additionally, Durr asserted that the City's justification for refusing to declare substantial completion here amounted to bad faith.  [*Id.* ¶ 194–212].  It further argued that the City's conduct amounted to a breach of the express and implied covenants within the contract.  [*Id.* ¶ 221–32].  Durr added that the City's refusal to declare substantial completion led to extra work and additional costs in 2017 for repairing finished ductwork damaged during "change order work-post-coordination between the various prime contractors." [*Id.* ¶¶ 234–35].

### 5.  Durr's Causes of Action

Durr's Complaint raised eleven causes of action.  First, it asked for a declaratory judgment under 28 U.S.C. §§ 2201, 2202, and Federal Rule of Bankruptcy Procedure ("**Fed. R. Bankr. P.**") 7001(9) (the "**First Cause of Action**").  [*Id.* ¶¶ 247–55].  Second, it argued that Defendants

breached the Contract when they knowingly let the Project out to bid based on designs that Defendants knew were incomplete and defective (the "**Second Cause of Action**"). [*Id.* ¶¶ 256–64]. Third, Durr raised another breach of contract claim based on the denial of access to the work site (the "**Third Cause of Action**"). [*Id.* ¶¶ 265–72]. Fourth, it argued that Defendants breached the Contract by causing uncontemplated delays (the "**Fourth Cause of Action**"). [*Id.* ¶¶ 273–78].

Fifth, Durr contended that Defendants breached the contract because of Durr's having to perform extra work repairing previously installed ductwork (the "**Fifth Cause of Action**") [*Id.* ¶¶ 279–83]. Sixth, Durr asserted a breach of contract claim for lost productivity (the "**Sixth Cause of Action**"). [*Id.* ¶¶ 284–87]. Seventh, Durr brought a breach of contract claim for withholding fees (the "**Seventh Cause of Action**"). [*Id.* ¶¶ 288–93]. Eighth, it argued that Defendants breached the contract under the modified cost method (the "**Eighth Cause of Action**"). [*Id.* ¶¶ 294–302]. Ninth, Durr asserted a claim for the breach of the implied covenant of good faith and fair dealing (the "**Ninth Cause of Action**"). [*Id.* ¶¶ 303–07]. Tenth, Durr raised a turnover of retainage claim under 11 U.S.C. § 542 (the "**Tenth Cause of Action**"). [*Id.* ¶¶ 308–15]. Eleventh, Durr raised a fraudulent transfer claim under 11 U.S.C. § 544 (the "**Eleventh Cause of Action**"). [*Id.* ¶¶ 316–21]. In addition to declaratory relief, Durr asked for damages, interest, attorneys' fees, and costs. [*See generally id.*].

## C. Procedural History and the Supplemental Motion to Compel ADR

Defendants moved to dismiss the Complaint in part. [ECF No. 5]. They moved to dismiss the First Cause of Action and portions of the Fifth and Seventh Causes of Action pursuant to Federal Rule of Civil Procedure ("**Fed. R. Civ. P.**") 12(b)(1), and to dismiss the First, Fifth, Seventh, Eighth, Ninth, Tenth, and Eleventh Causes of Action pursuant to Fed. R. Civ. P. 12(b)(6). [*Id.*]. They also asked for the court to permissively abstain, under 28 U.S.C. § 1334(c)(1), from

adjudicating any claims that remained following resolution of the Motion to Dismiss in part.  [*Id.*].

As to the First Cause of Action and portions of the Fifth and Seventh Causes of Action, Defendants argued that Durr needed to pursue those claims pursuant to the Contract's ADR provision.  [ECF No. 5-1 ¶¶ 20–28 (quoting Article 27 of the Contract)].

The Court held a hearing on the Motion to Dismiss.  [*See* ECF No. 10 (Hearing Transcript)].  The parties reported that the sole remaining obstacle to the City's declaring substantial completion was the repair of six dehumidification units ("**DHUs**").  [*Id.* at 25].  The Court then dismissed the Tenth and Eleventh Causes of Action and otherwise reserved judgment. [ECF No. 8].  It also set a briefing schedule on a supplemental motion "to compel compliance with the contract dispute resolution procedures under the parties' contract relating to the specific, disputed issues affecting the certification of the Debtor's 'substantial completion,' and the scope of the Court's subject matter jurisdiction over such disputes."  [ECF No. 9 (strikethrough omitted)]. The Court further ordered Defendants to identify what work remained with the DHUs.  [ECF No. 10 at 30].

Defendants then filed the supplemental Motion to Compel ADR.  That motion centered on the ADR Provision, which incorporates "almost verbatim" Section 4-09 of Title 9 of the Rules of the City of New York ("**RCNY**"), also known as the Public Procurement Board Rules (the "**PPB Rules**").  [ECF No. 11-4 at 3].

As to the First Cause of Action, Defendants offered context for Durr's allegations that the Contract's specification incorporated the Consent Decree.  As noted, the specification Durr referred, to, Detailed Specification 01271, provides that:

> [t]he work under these Contracts shall be entirely completed in a manner acceptable to the City within the Period of Performance indicated in Schedule A in the General Conditions.  The work to be performed under [the Contract] is subject to the Order on Consent in the US District Court of Eastern New York.

[*Id.* at 20 (quoting ECF No. 1-1 at 22 (pdf pag))].  Defendants argued that this specification pertains only to liquidated damages for failure to timely complete the Project and adhere to Consent Decree milestones.  [*Id.*]

According to Defendants, the parties have three disagreements about Detailed Specification 01271.  [*Id.*].  The first disagreement is whether it "wholly incorporates" the Consent Decree.  [*Id.*].  The second disagreement is whether the specification equates the attainment of a Consent Decree milestone with Durr's achieving substantial completion of its duties under the Contract.  [*Id.*].  The third disagreement is whether the specification supersedes the provisions of Articles 14 and 44 of the Contract concerning the declaration of substantial completion.  [*Id.*].  Defendants argue that resolving these disputes requires interpreting the Contract's Detailed Specification 01271 as well as Articles 14 and 44, and that, because Article 27 of the Contract requires ADR of "disputes about . . . the interpretation of Contract documents," the disputes must go to ADR.  [*Id.* at 20–21].

As to the portion of the Fifth Cause of Action at issue in the Motion to Compel ADR, which concerns ductwork repair, Defendants asserted that Durr had already commenced an ADR proceeding for that dispute.  [*Id.* at 21].  In that proceeding, before the Contract Resolution Dispute Board ("**CDRB**"), Durr argued that a subcontractor was responsible for ductwork damage, and that the City should seek payment from that subcontractor.  [*Id.*]  According to Defendants, this portion of the Fifth Cause of Action, in which Durr sought payment for extra work, was duplicative of the pending CDRB proceeding, required an interpretation of the Contract, and thus should also proceed through ADR.  [*Id.* at 22].

Defendants' Motion to Compel ADR invokes 9 U.S.C. §§ 2, 3, and 4, and seeks an order compelling Durr to comply with the ADR Provision as to the First Cause of Action, and the claim

in the Fifth Cause of Action relating to repairing ductwork, among other relief.[1] [*Id.* at 1–2]. They

argued that the Federal Arbitration Act ("**FAA**") requires the Court to direct certain disputes to

ADR. [ECF No. 11-4 at 7–15]. As to the DHUs, Defendants mentioned them only in a footnote

of their memorandum of law:

> [Durr] also disagrees with DEP's withholding of a declaration of substantial
> completion in 2017 based on DEP's discovery of malfunctioning dehumidification
> units ("DHUS"), an issue that continues to the present. While [Durr] does not seek
> a 2017 substantial completion date in its Complaint, such a dispute would also need
> to be resolved through ADR for similar reasons as set forth in Point II(a).

[*Id.* at 18 n.7]. In another footnote, Defendants reserved their rights to challenge the action on

timeliness grounds. [*Id.* at 18 n.6]. They asked for the Court to grant the Motion to Compel ADR

and to stay this adversary proceeding pending the ADR's outcome. [*Id.* at 15–16].

In opposition, Durr contended that Defendants failed to establish: (1) any issues with

Durr's work on the DHUs that would prevent a declaration of substantial completion; or (2) that

an arbitrable dispute existed regarding the DHUs that would require resorting to the ADR

Provision in order to determine whether Durr had achieved substantial completion. [ECF No. 12

at 6–11]. In particular, Durr argued that the City not only declined to specify what work remained

as to the DHUs, it also failed even to demonstrate that Durr was under any contractual obligation

to perform DHU work. [*Id.* at 2, 8 ]. In fact, Durr asserted, it could demonstrate that it had no

continuing contractual obligations to the City concerning the DHUs, in that: (1) the City accepted

all of the DHUs in 2014, pursuant to Article 16 of the Contract; (2) under Article 16, to accept the

DHUs is to deem the work on them substantially complete, relieve Durr of its obligation to protect

the DHUs from damage, and start Durr's one-year guarantee period on the City's use of the DHUs,

---

[1] Defendants also sought to compel arbitration as to a portion of the Plaintiff's Seventh Cause of
Action, but the Plaintiff has since withdrawn that claim. [ECF No. 12 at 12 n.8].

which expired in 2015; and (3) the City returned to Durr the retainage held as Security on the DHUs. [*Id.* at 8–10]. Durr added that any defect in the DHUs flowed from the City's inadequate designs and specifications for the Project, and that Durr has no obligation to the City with regard to those designs and specifications. [*Id.* at 10–11].

Durr further contended that the First Cause of Action was beyond the scope of the ADR Provision, in that the First Cause of Action assertedly is based on a judicial estoppel theory, and has nothing to do with whether Durr's work satisfied the Contract's requirements. [*Id.* at 7, 12–23]. Durr also argued that the PPB Rules, the basis for the ADR Provision, do "not apply to Consent Decree requirements," and that an interpretation of the Consent Decree as to substantial completion accordingly is beyond the jurisdiction of the Contract's ADR process. [*Id.* at 17 (citing a different section of the PPB rules, 1 RCNY § 1-02)]. As to the Fifth Cause of Action, Durr argued that the issue of substantial completion was dispositive of the issue of whether or not Durr had an absolute obligation to protect the ductwork from damage. [*Id.* at 12 n.8]. Finally, Durr argued that the Court had subject matter jurisdiction over the declaratory judgment issue. [*Id.* at 23–24]. Durr raised no allegations as to Detailed Specification 01271.

In reply, Defendants argued that Durr conceded that to rule on substantial completion one must interpret the Contract, namely, Detailed Specification 10271 and its interplay with the Contract's articles. [ECF No. 13 at 3–6]. Defendants also objected that Durr raised new arguments in its opposition as to the basis for declaratory relief and as to the DHUs, [*id.* at 8–13], and that Durr's judicial estoppel argument should be disregarded because it does not appear in its Complaint, [*id.* at 13–15].

### D. The Hearing on the Supplemental Motion

On March 17, 2021, the Court held a hearing at which the parties argued Defendants'

supplemental motion, [*see* ECF No. 18 (Hearing Transcript)], and Defendants reported by way of

an update that the City deemed the Contract substantially complete as of February 5, 2021. [*Id.* at

6]. There remained six items of DHU work on Durr's "punch list," but this work was "no longer

at a state where it is holding up substantial completion." [*Id.*]. Thus, Defendants argued, the key

issue was when substantial completion occurred. [*Id.* at 6–7]. They also argued that the

determination of the date of substantial completion was a matter for ADR. [*Id.* at 7].

Counsel for Durr reported that, notwithstanding the City's report, the Principal of Durr has

been told that the City would not deem substantial completion to have occurred until Durr reached

agreement to complete all tasks on the punch list. [*Id.* at 15.]

## II. Discussion

### A. Legal Standard on Motions to Compel Arbitration

The FAA "establishes a 'federal policy favoring arbitration agreements,'" and "mandates

the enforcement of contractual arbitration provisions." *MBNA Am. Bank, N.A. v. Hill*, 436 F.3d

104, 107 (2d Cir. 2006) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S.

1, 24 (1983) (internal citation omitted)); *see also AT&T Mobility LLC v. Concepcion*, 563 U.S.

333, 346 (2011). By statute, a written agreement to arbitrate "shall be valid, irrevocable, and

enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."

9 U.S.C. § 2; *see MBNA Am. Bank*, 436 F.3d at 107–08. Courts resolve any doubts concerning the

scope of arbitrable issues in favor of arbitration, "whether the problem at hand is the construction

of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability."

*Brownstone Inv. Grp., LLC. v. Levey*, 514 F. Supp. 2d 536, 549 (S.D.N.Y. 2007) (internal

quotations and citation omitted); *In re Residential Cap., LLC* ("*ResCap*"), 563 B.R. 756, 766–70

(Bankr. S.D.N.Y. 2016) (ruling that plaintiffs' allegations in the complaint in question arose out

of and related to insurance policies that had arbitration clauses covering such disputes). This

arbitration-favoring policy applies even in instances in which granting a motion to compel would create "separate proceedings in different forums." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 217 (1985).

In the bankruptcy context, however, courts have greater leeway to decline to enforce arbitration agreements. "The Second Circuit has recognized that a Bankruptcy Court has discretion to decline to compel arbitration when a conflict exists between the Bankruptcy Code, which favors centralization of disputes concerning a debtor's estate, and the Arbitration Act, which advocates a decentralized approach to dispute resolution." *In re Winimo Realty Corp.*, 270 B.R. 108, 118 (Bankr. S.D.N.Y. 2001) (internal quotation marks omitted) (citing *In re Crysen/Montenay Energy Co.*, 226 F.3d 160, 166 (2d Cir. 2000)). Still, in general, "the presumption in favor of arbitration generally will trump the lesser interest of bankruptcy courts in adjudicating non-core proceedings in favor of arbitration." *In re Crysen*, 226 F.3d at 166.

A bankruptcy court facing a motion to compel arbitration applies a four-step analysis:

> [F]irst, it must determine whether the parties agreed to arbitrate; second, it must determine the scope of that agreement; third, if federal statutory claims are asserted, it must consider whether Congress intended those claims to be nonarbitrable; and fourth, if the court concludes that some, but not all, of the claims in the case are arbitrable, it must then decide whether to stay the balance of the proceedings pending arbitration.

*Bethlehem Steel Corp. v. Moran Towing Corp.* (*In re Bethlehem Steel Corp.*), 390 B.R. 784, 789 (Bankr. S.D.N.Y. 2008) (hereinafter "*Bethlehem Steel*"); *see also Togut v. RBC Dain Correspondent Servs.* (*In re S.W. Bach & Co.*), 425 B.R. 78, 87 (Bankr. S.D.N.Y. 2010). Each factor is discussed in turn below.

### B. Whether the Parties Agreed to Arbitration

Whether the parties agreed to arbitrate is a "threshold question." *In re MF Global Holdings Ltd.*, 571 B.R. 80, 91 (Bankr. S.D.N.Y. Aug. 24, 2017) ("*MF Global*") (citing *Mitsubishi Motors*

*Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985) ("[T]he first task of a court asked

to compel arbitration of a dispute is to determine whether the parties have agreed to arbitrate that

dispute.")).  This issue is for a court to determine "unless the parties clearly and unmistakably

provide otherwise."  *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016) (internal

quotation marks omitted).  The FAA requires courts to rigorously enforce arbitration agreements

according to their terms.  *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1621, 200 L. Ed. 2d. 889

(2018).

In this case, the parties agreed to send specified types of disputes to alternative dispute

resolution.  The ADR Provision—specifically, Article 27.1 of the Contract—states that ADR is to

be the exclusive means of resolving disputes "of the kind delineated in this article that arise under,

or by virtue of, this Contract," which, as elaborated in Article 27.1.2, include "disputes about,"

among other things, "the scope of work delineated by the Contract," the "interpretation of Contract

documents," and the "acceptability and quality of the Contractor's Work[.]"  [*See* ECF No 1-1 at

89 (pdf pag.)].

## C.  The Scope of the ADR Provision

In gauging the scope of an ADR clause, courts assess whether the provision is "narrow" or

"broad."  *MF Global,* 571 B.R. at 92; *Bethlehem Steel*, 390 B.R. at 789–90.  A broad clause

"purport[s] to refer all dispute arising out of a contract to arbitration," whereas a narrow arbitration

clause "limit[s] arbitration to specific types of disputes."  *McDonnell Douglas Fin. Corp. v. Pa.*

*Power & Light Co.*, 858 F.2d 825, 832 (2d Cir. 1988).  The Second Circuit has expanded on the

relevance of this distinction:

> In construing arbitration clauses, courts have at times distinguished between "broad"
> clauses that purport to refer to all disputes arising out of a contract to arbitration and
> "narrow" clauses that limit arbitration to specific types of disputes.  If a court
> concludes that a clause is a broad one, then it will order arbitration and any
> subsequent construction of the contract and of the parties' rights and obligations

under it are within the jurisdiction of the arbitrator.

*Bethlehem Steel*, 390 B.R. at 790 (italics omitted)(quoting *Collins & Aikman Prods. Co. v. Bldg. Sys., Inc.*, 58 F.3d 16, 20 (2d Cir. 1995)).  Courts will presume arbitrability as a result of a broad arbitration clause.  *Kittay v. Landegger (In re Hagerstown Fiber Ltd. P'ship)*, 277 B.R. 181, 197 (Bankr. S.D.N.Y. 2002) (hereinafter "*Hagerstown*").  As to a "narrow" clause, Courts look at the language of the clause and determine whether "'the question at issue is on its face within the purview of the clause.'"  *Bethlehem Steel*, 390 B.R. at 790 (quoting *McDonnell Douglas Fin. Corp.*, 858 F.2d at 832).

As the parties here agree [ECF Nos. 11-4 at 13, 12 at 12], the language of the ADR Provision is narrow within the meaning of the case law, because it enumerates specific types of disputes to which it applies.  [*See* ECF No. 1-1 at 89 ("This article [27.1.2] shall apply only to disputes about the scope of work delineated by the Contract, the interpretation of Contract documents, the amount to be paid for Extra Work or disputed work performed in connection with the Contract, the conformity of the Contractor's Work to the Contract, and the acceptability and quality of the Contractor's Work.")]; *see also Microsoft Corp. v. Samsung Elecs. Co., Ltd.*, 60 F. Supp. 3d 525, 530 (S.D.N.Y. 2014).  Defendants argue that the ADR Provision applies to the First Cause of Action and portions of the Fifth and Seventh Causes of Action.  Durr has withdrawn the portion of the Seventh Cause of Action subject to the Motion to Compel ADR, ECF No. 12 at 12 n.8, leaving only the first and portions of the fifth causes of action in issue.

### 1.  As to the First Cause of Action

The parties disagree about the meaning of "substantial completion" and the source of that term's definition.  Durr urges that the Consent Decree prevails over the Contract, because Detailed Specification 01271 and the PPB rules provide that the PPB rules do not apply to consent decree requirements.  [*See* Durr's opposition, ECF No. 12, at 17].  Defendants, meanwhile, insist that the

Contract is the controlling document notwithstanding its reference to the Consent Decree.  [*See,
e.g.*, ECF No. 13 (Defendants' reply) at 3–4 (even Durr's contentions invoking the Consent Decree
require "an interpretation of Detailed Specification 01271 to determine whether this specification
incorporates the Consent Decree into the Contract, and whether it affects [Durr's] Contractual
rights and obligations")].

Defendants are correct that to resolve this dispute in favor of either party necessarily
requires interpreting the Contract, because—especially given that Durr is not a direct party to the
Consent Decree—the only way the Consent Decree informs Durr's obligations and entitlements is
via the Contract, by virtue of the provision of the Contract's Detailed Specification 01271 that "the
work to be performed under [the Contract] is subject to" the Consent Decree.  And the ADR
Provision, despite its technically narrow wording, explicitly requires ADR for disputes involving
"the interpretation of Contract documents."  [ECF No. 5-1 ¶ 22 (quoting Art. 27.1.2 of the
Contract)]; *see Bethlehem Steel*, 390 B.R. at 790 (directing courts reviewing a narrow-form clause
to determine whether "'the question at issue is on its face within the purview of the clause.'")
(quoting *McDonnell Douglas Fin. Corp.*, 858 F.2d at 832)).

In fact, even Durr's attempt to characterize its dispute as turning on the Consent Decree
does not seek direct enforcement of the Consent Decree without reliance on the Contract.  Rather,
as Durr puts it, "the dispute in [Durr's] first cause of action . . . requires a determination  of . . . the
City's obligation to issue a certificate of Substantial Completion to [Durr] *under Article 44 of the
Contract* based on [the City's] representations to the Regulators that Substantial Completion . . .
occurred on December 9, 2013."  [ECF No. 12 at 19 (emphasis added); *see also* Complaint (ECF
No. 1) at 1–2 (summarizing relief sought as "(i) declaratory relief as to the parties' rights and
obligations under the terms of the Contract . . . and (ii) an order requiring the City to turnover and

pay all amounts due and owing [Durr] for construction services rendered under the terms of its Contract")]. And, as Defendants correctly observe, motions to compel arbitration center on the allegations actually contained in the Complaint in question. *See ResCap.*), 563 B.R. at 770 ("The Plaintiffs cannot escape the broad scope of arbitration by re-characterizing the allegations in the Complaint in a light most favorable to their position") (citations omitted). The First Cause of Action, then, constitutes a "dispute[] about . . . the interpretation of Contract documents," Art. 27.1.2 [ECF No. 1-1 at 89], albeit one that in Durr's view is also affected by the Consent Decree and the City's related representations to the "Regulators."

Durr's PPB argument does not change the outcome. Section 1-02(d)(1) of the PPB Rules, entitled "Applicability of the PPB Rules," provides: "[t]hese Rules shall not apply to procurements to the extent that a source of funds outside the City of New York, a federal or State statute or rule, the terms of a court order or consent decree, or other applicable law expressly authorizes or requires otherwise." 9 RCNY § 1-02(d)(1). But Durr identifies nothing in the Consent Decree, nor any other relevant document or provision, that "expressly authorizes or requires otherwise"; to the contrary, Durr relies simply on the fact that the Contract by its own terms is "subject to the terms of the Consent Decree." [*See* ECF No. 1 ¶¶ 14, 24; *see also* ECF No. 12 at 7 ("The City cannot credibly deny that the Contract was made expressly subject to the terms of a Consent Decree.")]. The parties' dispute, then, calls for the construction and application of the Contract as the governing document, in the course of which Durr is free to make arguments regarding the significance of the Contract's reference to the Consent Decree. The existence of the Consent Decree does not, however, transform the parties' dispute into one that arises directly under that decree, as opposed to arising under the Contract that the parties themselves agreed to—including with respect to its reference to the Consent Decree.

For similar reasons, Durr cannot overcome the applicability of the ADR provision by objecting that the resulting arbitration will not provide an effective forum for Durr to assert that Defendants are judicially estopped from denying that substantial completion occurred as of the date Defendants certified substantial completion for purposes of the Consent Decree.  Judicial estoppel "prevents a party from asserting a factual position in one legal proceeding that is contrary to a position that it successfully advanced in another proceeding."  *Rodal v. Anesthesia Grp. of Onondaga, P.C.*, 369 F.3d 113, 118 (2d Cir. 2004).  The dispute requires determination whether and when Durr achieved "substantial completion" under the Contract, and even Durr's judicial estoppel argument requires, among other things, assessing whether Durr is correct that that term means the same thing under both the Contract and the Consent Decree.  This question inescapably entails interpreting the Contract, and nothing will preclude Durr from arguing that Defendants' prior representations in connection with the Consent Decree bear on that key question.  The applicability or inapplicability of the judicial estoppel doctrine in ADR does not transform the parties' dispute into one in which contractual interpretation is no longer central.

### 2.   As to the At-Issue Portion of the Fifth Cause of Action

Also within the scope of the ADR Provision is the part of the Fifth Cause of Action dealing with extra work for the damaged ductwork.  No additional lengthy discussion of this issue is required.  The Contract's Article 27.1.2 is again directly on point, because it mandates ADR concerning claims for "Extra Work or disputed work performed in connection with the Contract." [ECF No. 5-1 ¶ 22].  Durr has not articulated any persuasive reason why this provision does not cover its claims for extra work on ductwork.

### D.  Whether Congress Intended to Exclude this Dispute from Arbitration

The third *Bethlehem Steel* factor calls for consideration of "Congress's policy in favor of arbitration as weighed against the important federal interests embodied in the Bankruptcy Code."

*Cardali v. Gentile (In re Cardali)*, Case No. 10-11185 (SHL), Adv. Pro. No. 10-3531 (SHL), 2010 WL 4791801, at *7 (Bankr. S.D.N.Y. Nov. 18, 2010).  In applying this prong, courts typically inquire whether the matter is a core or non-core bankruptcy proceeding.  *See MF Global*, 591 B.R. at 93; *Cardali*, 2010 WL 4791801, at *7.   Non-core matters are "unlikely to present a conflict sufficient to override by implication the presumption in favor of arbitration," *Cardali*, 2010 WL 4791801, at *7 (quoting *Hagerstown*, 277 B.R. at 201 (citation omitted)), but "a determination that a proceeding is core will not automatically give the bankruptcy court discretion to stay arbitration." *Cardali*, 2010 WL 4791801, at *7 (citing *In re Crysen*, 226 F.3d at 166).

To determine whether claims arising under a contract are core, courts consider: "(1) whether the contract is antecedent to the reorganization petition; and (2) the degree to which the proceeding is independent of the reorganization."  *U.S. Lines, Inc. v. Am. S.S. Owners Mut Prot. & Indem. Ass'n (In re U.S. Lines, Inc.)*, 197 F.3d 631, 637 (2d Cir. 1999).  This second question hinges on "the nature of the proceeding."  *Id.* (quoting *S.G. Phillips Constructors, Inc. v. City of Burlington (In re S.G. Phillips Constructors, Inc.)*, 45 F.3d 702, 707 (2d Cir. 1995)).   A proceeding's nature renders it core if either: "(1) the type of proceeding is unique to or uniquely affected by the bankruptcy proceedings, or (2) the proceedings directly affect a core bankruptcy function."  *Id.* (internal citation omitted); *ResCap.*, 563 B.R. at 770.

First, the Contract is "antecedent to the reorganization petition," in the wording of *U.S. Lines*.  The parties entered into the Contract more than a decade before Durr filed for bankruptcy. *See in re Residential Cap., LLC*, No. 15-cv-2712 (JPO), 2015 WL 9302834, at *3 (S.D.N.Y. Dec. 21, 2015) (contract in question was entered into prepetition, making it antecedent to the bankruptcy).  And the bulk of the dispute likewise arose before Durr filed its petition.  Durr alleges that substantial completion occurred nearly five years before the bankruptcy, and that its extra

work repairing ductwork happened one year before the bankruptcy.  The only arguably post-petition event at issue is Defendant's disputed assertion that substantial completion occurred only recently.  But the Contract and the bulk of the disputes giving rise to both Causes of Action began years before Durr filed its Chapter 11 petition.  This weighs against core status.  *See Tilton v. MBIA Inc.*, 620 B.R. 707, 720 (S.D.N.Y. 2020); *contrast Del. Tr. Co. v. Wilmington Tr., NA*, 534 B.R. 500, 511 (S.D.N.Y. 2015) (deeming a matter core because "although the contract in the present case preceded the bankruptcy, the dispute did not") (emphasis omitted).

The second *U.S. Lines* factor—the degree to which the proceeding is independent of the bankruptcy—also does not outweigh the policy in favor of enforcing contractual arbitration provisions.  First, the bankruptcy case's progress does not hinge on the parties' dispute.  Durr's confirmation hearing on its plan of liquidation is scheduled for June 17, 2021, [*see* Bankr. ECF Nos. 523 (Third Amended Plan of Liquidation), 524 (order approving disclosure statement))], and Durr's Third Amended Plan of Liquidation contemplates that this dispute will continue to be litigated and that, if and when proceeds are realized, they can be distributed according to the terms of the Plan.  [*See* Disclosure Statement (ECF No. 522) at 29–30 (the "Liquidating Trustee will continue with the (a) limited wind down operations, if any; and (b) prosecution of the Affirmative Claims"; the "continued prosecution of the Affirmative Claims, until disposition, whether by adjudication or settlement, . . . will promote the most effective prosecution of the Affirmative Claims, and therefore the ultimate monetary recoveries thereon.")].  Nor has Durr contended in connection with this Motion that a recovery in this dispute is necessary either to permit confirmation or to fund the estate's post-confirmation administration.  And, as Defendants correctly contend, the only arguably core matters that were ever raised in this case—the Tenth (turnover) and Eleventh (fraudulent transfer) causes of action—have already been dismissed.

[ECF No. 11 at 14]. Even if the First Cause of Action and part of the Fifth Cause of Action were core, as Defendants argue, sending them to ADR would not create an "actual and irreconcilable conflict between the FAA and the Bankruptcy Code." [*Id.* at 15].

Durr fails to overcome these considerations. Durr asserts generally that the proceeding directly affects the core functions of administration of the estate and the liquidation of the estate's assets, [ECF No. 12 at 21], and that this lawsuit constitutes the estate's second largest asset, and that a ruling on substantial completion is a condition precedent to any estate recovery from the City. [*Id.* at 21–22]. But, as noted, any recovery can come later, and will be used to fund distributions to creditors if and when the hoped-for recovery is realized. This situation does not require departing from the normal path of enforcing applicable ADR provisions.

Accordingly, the Court grants Defendants' Motion to Compel ADR as to the First Cause of Action and the at-issue portion of the Fifth Cause of Action.

### E.  Whether to Stay the Adversary Proceeding

In light of the granting of Defendants' Motion to Compel ADR, which applies only to a subset of the parties' dispute, the Court must proceed to decide whether to stay the balance of the proceedings pending arbitration. *Bethlehem Steel*, 390 B.R. at 789. A stay is warranted here.

As a threshold matter, the non-arbitrable claims do not fall under the mandatory stay required by Section 3 of the FAA. *See Hagerstown*, 277 B.R. at 199 n.18 (citing *Citrus Mktg. Bd. v. J. Lauritzen A/S*, 943 F.2d 220, 225 (2d Cir. 1987)). Nevertheless, courts recognize that a broad stay order is appropriate where there are common questions of fact between the arbitrable and non-arbitrable claims, and where issuing the order will promote the interests of judicial economy. *See In re S.W. Bach & Co.*, 425 B.R. at 98 (collecting cases).

Here, neither party disputes the connectedness of the causes of action that are subject to the Motion to Compel ADR, and those that are not. All of Durr's causes of action arise from the

HVAC Contract and pertain to various difficulties Durr experienced in attempting to fulfill its obligations under the Contract.  Imposing a stay as to non-arbitrable claims here will avoid piecemeal litigation of these overlapping issues.  *See Katsoris v. WME IMG, LLC*, 237 F. Supp. 3d 92, 110–11 (S.D.N.Y. 2017) (collecting cases and instructing that "[t]he Court must consider actors such as the desirability of avoiding piecemeal litigation and the degree to which the cases necessitate duplication of discovery or issue resolution") (internal quotation marks omitted); *see also Morelli v. Alters*, No. 19-cv-10707 (GHW), 2020 WL 2306445, at *4 (S.D.N.Y. May 8, 2020) (observing that discretionary stays are appropriate where the arbitrable and non-arbitrable claims contain significant overlap).  Further, as Durr notes, a declaration of substantial completion is critical to the Contract, the claims in this action, and the estate's ability to recover funds, such that other aspects of the case logically should await clarity on that central issue.  [ECF Nos. 12 at 21–22; 18 at 16–17, 48 ("I do think the other causes of action should be held in abeyance until, one, until there's a ruling on substantial completion, and two, until we get to the Comptroller's office.")].

Accordingly, the Court will continue to reserve judgement on the Motion to Dismiss while the parties engage in the ADR process.

**CONCLUSION**

For the foregoing reasons, the Court grants Defendants' Motion to Compel ADR as to all of the First Cause of Action and a portion of the Fifth Causes of Action.  The Court will hold the remainder of this proceeding in abeyance pending completion of the ADR process, and will continue to reserve judgment on the Motion to Dismiss.

Defendants are to settle an order on five business days' notice by filing a notice of the proposed order on the Case Management/Electronic Case Filing docket, with a copy of the

proposed order attached as an exhibit to the notice.   A copy of the notice and the proposed order shall also be served upon opposing counsel.   The parties are encouraged to attempt to reach agreement on the form of the proposed order.

IT IS SO ORDERED.

Dated: New York, New York
       June 16, 2021

                                        *s/ David S. Jones*
                                        HONORABLE DAVID S. JONES
                                        UNITED STATES BANKRUPTCY JUDGE